UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DREW D. FUNDERBERG,<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>IAN G. DUNLAP et al.,<br><br>　　　　　　　　Defendant. | CASE NO. 3:25-cv-05207-DGE<br><br>ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 2). |

## I　　INTRODUCTION

This matter comes before the Court on Plaintiff's motion for a temporary restraining order ("TRO"). (Dkt. No. 2.) For the foregoing reasons, the motion is GRANTED.

## II　　BACKGROUND

**A.　　Factual Background**

Plaintiff is a petty officer and master-at-arms third class (MA3) in the U.S. Navy. (Dkt. No. 1 at 3.) He has served on active duty for almost four years at Marine Corps Security Forces Battalion (MCSFB), in Bangor, Washington. (*Id.*)  In late November of 2023, Plaintiff

submitted a urine sample as part of a random drug test. (*Id*. at 4.) The urinalysis came back positive for tetrahydrocannabinol (THC) 9 cannabinoid. (*Id*.) Plaintiff represents that he was caught off guard by the result, as he did not willfully consume a marijuana product. (Dkt. No. 1-1 at 3.) After speaking with his wife, he realized that the "Zzz NyQuil's gummies" he had meant to take to aid with insomnia had been "Cannabis Infused Sour Blackberry Fruit Chews" belonging to his wife. (*Id*. at 3, 6.) The chews are legal for purchase in Washington, and his wife had been keeping them next to the Zzz NyQuil gummies on a dresser where their children would not be able to reach them. (*Id*. at 6.) Plaintiff had not taken sleep aids before; he had only just began struggling with insomnia as a result of his father's death. (*Id*. at 3.)

After realizing what had happened, Plaintiff informed his chain of command. (Dkt. No. 1 at 4.) On January 18, 2024, Plaintiff filed a "Request For Finding Of Unknowing Or Innocent Ingestion." (*Id*. at 5.) On January 23, 2024, Defendant Lieutenant Colonel Ian G. Dunlap—plaintiff's commanding officer (CO)—signed a decision letter stating: "I do not find your claim of unknowing ingestion to be credible." (Dkt. No. 1-1 at 37.) Defendant David Elis, the legal officer at MCSFB, subsequently summoned Plaintiff to his office and served Plaintiff with an administrative separation notice ("ADSEP"). (*Id*. at 38; Dkt. No. 1 at 2.) The basis for Plaintiff's termination was listed as "separation by reason of misconduct – drug abuse" and plaintiff would be terminated under the "general" designation, making him ineligible to reenlist. (*Id*.) Plaintiff pursued his right to review of his case by the General Court-Martial Convening Authority (GCMCA). (Dkt. No. 1 at 8.)

On March 27, 2024, Captain Fahlenkamp, the Commanding Officer of Strategic Weapons Facility Pacific (SWFPAC), overruled Dunlap's ADSEP decision, writing: "Given this Sailor's history and the statements provided in enclosure (1), I believe this to be an incident of

innocent ingestion." (Dkt. No. 1-1 at 20.) Fahlenkamp forwarded his decision to the Navy Culture and Force Resilience Office (NCFRO) for review. (*Id*.) The NCFRO then issued a letter stating: "After careful consideration of the available information [NCFRO] determined that the positive urinalysis results . . . must be processed for administrative separation or by a board of inquiry, if applicable." (Dkt. No. 1-1 at 41.)

Plaintiff then brought the case to his Separation Authority[1] and first flag officer, General Court-Martial Convening Authority, Admiral Marc Sucato, Commander, Navy Region Northwest. Plaintiff submitted a request for an ADSEP Board hearing to Sucato. (*Id*. at 10.) The request reiterated Plaintiff's desire to continue serving in the Navy and pointed to the positive reviews he had received during the pendency of the case. (Dkt. No. 1-1 at 23.) Indeed, he had recently been recommended for advancement due to his management skills, technical expertise, and position as a "role model" in the community. (*Id*. at 24.) Sucato issued a decision that refused to discharge Plaintiff unless Dunlap granted Plaintiff's request to present the case to an Administrative Separation Board ("ADSEP board"). (Dkt. No. 1 at 10.)[2]

Instead of referring the case to the review board as instructed by Sucato, Dunlap referred the case to a different admiral and requested the discharge of Plaintiff without giving him a hearing. (*Id*.) The case went to Defendant Vice Admiral Johnny R. Wolfe Jr., Commander, Strategic Systems Programs. (*Id*.) On February 28, 2025, Wolfe granted authority to discharge Plaintiff for "separation by reason of misconduct – drug use." (Dkt. No. 1-1 at 43.) Plaintiff

---

[1] A Sailor's "Separation Authority" is responsible for approving the discharge of a Sailor. *See Ruffin v. United States*, No. 12-101C, 2012 WL 4450979, *11 (Fed. Cl. Sept. 25, 2012), aff'd, 509 F. App'x 978 (Fed. Cir. 2013).

[2] Plaintiff cites Sucato's decision, but a copy of the decision does not appear in the docket. *See* generally Dkt. No. 1-1. Plaintiff is directed to file a copy of the decision promptly to make a complete record.

then received an email indicating that "Navy Admin" had received his "10 day letter," and requesting that he report to start the separation process. (*Id*. at 45.) Accordingly, Plaintiff may be discharged from the Navy starting on March 14, 2025.

### B.    Procedural Background

Plaintiff filed a complaint against Ian Dunlap, David Ellis, Johhny Wolffe, Jr., and Terence Emmert (collectively, "Defendants") on March 13, 2025. (Dkt. No. 1.) Plaintiff immediately moved for a temporary restraining order enjoining Defendants from discharging Plaintiff "unless and until they comply with OPNAVINST 5350.4E, Chapter 4, paragraph 6.m., by affording [P]laintiff a right to have his unknowing ingestion claim reviewed by an ADSEP board." (Dkt. No. 2 at 22.)

OPNAVINST 5350.4E, Chapter 4, paragraph 6.m. is a Navy regulation that provides: "All cases of unknowing ingestion must be reviewed at an ADSEP board or board of inquiry." (Dkt. No. 1-1 at 94.) Plaintiff argues that "Navy regulations require this case to be reviewed by an ADSEP board," and further points out that "[a] Navy Captain found his unknowing ingestion case to be credible, in writing," and "Admiral Sucato refused to discharge plaintiff without an ADSEP board reviewing the case, and he was correct and in line with the regulation." (Dkt. No. 2 at 2, 9.) Accordingly, Plaintiff alleges that his discharge violated 10 U.S. Code § 1169 and that he is entitled to review of his case under OPNAVINST 5350.4E. (*Id*. at 10.) Plaintiff further alleges that Wolfe violated Navy regulations by ordering his discharge without Separation Authority. (*Id*. at 9.)

### III    LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO. To obtain a TRO, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of

irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, "a party seeking to enjoin a military discharge must make a much stronger showing of irreparable harm than the ordinary standard for injunctive relief." *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985).[3]  Generally, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22. The moving party has the burden of persuasion. *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

---

[3] For the purposes of this Order, the Court applies the heightened standard as outlined in *Hartikka* and the decision upon which it relied: *Sampson v. Murray,* 415 U.S. 61 (1974). However, this caselaw may not have survived the Supreme Court's landmark decision in *Winter*. *See Winter*, 555 U.S. at 20. As another court recently explained: "In *Sampson*, a federal employee sued to prevent herself from being terminated pending her appeal to the Civil Service Commission.  The district court granted an injunction after finding a mere possibility of harm, and the court of appeals affirmed on similar grounds.  The Supreme Court reversed, holding that the court of appeals erred in suggesting that the District Court need not have concluded that there was actually irreparable injury. *Sampson* is thus a relic of the world before *Winter's* unambiguous rejection of the 'possibility' standard." *Roe v. Shanahan*, 359 F. Supp. 3d 382, 419 (E.D. Va. 2019), *aff'd sub nom. Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (cleaned up.)  Accordingly, when the Ninth Circuit applied *Sampson* in *Hartikka,* it was employing a flexible sliding scale approach that permitted the issuance of an injunction on "possible" harm. *See Hartikka*, 754 F.2d at 1518. After *Winter*, the federal preliminary injunction standard has aligned with what the Supreme Court described in *Sampson* and there is a real question as to whether *Hartikka*'s "stronger showing" language can be read to survive that development in the caselaw.  As the *Roe* court put it: "there is [now] but one standard for issuing injunctive relief, in military cases 'no less'—and no more—'than in other cases.'" *Roe*, 359 F.Supp.3d at 45 *(*citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006)). The Fourth Circuit recently wrote about a decision based on *Hartikka*: "*Guerra's* heightened requirement of irreparable harm does not prevent a preliminary injunction here.  At the time we decided *Guerra*, courts were required to "balance the irreparable harm to the respective parties, requiring only that the harm to the plaintiff outweigh the harm to the defendant." *Roe*, 947 F.3d at 229. Accordingly, in this Order, the Court assumes without deciding that the heightened standard still applies and will re-visit the question with the benefit of full briefing.

## IV    DISCUSSION

### A.    Irreparable Harm

The Court begins by addressing whether Plaintiff has established a likelihood of irreparable harm.  For purposes of injunctive relief, irreparable harm constitutes "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Additionally, in cases of military discharge, the harm must go beyond typical harms associated with losing one's job.  "[A]n insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).  Thus, courts must reserve injunctive relief for situations that present "extraordinary" fact patterns, for example, those with "unusual actions related to the discharge itself." *Id*.

If Plaintiff is discharged, he will be released with a RE-4 reentry code and a specification of "misconduct – drug use." (Dkt. No. 1 at 11.)  The general discharge disqualifies Plaintiff from the majority of jobs that would allow him to use his skillset, such as a law enforcement officer or security guard. (*Id*.)  Moreover, the specification of "misconduct due to drug use" results in "greater [social] stigma" than other designations, making it likely that Plaintiff will struggle to obtain *any* employment. *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995). Plaintiff is not college educated and the general discharge will also prevent him from using the G.I. bill to attend college, which would feasibly present another avenue to future employment. (*Id*.)  Additionally, Plaintiff suffered line of duty injuries in October of 2022 that involved his hand and both of his legs getting "torn" and "imploded." (*Id*. at 14.)  Plaintiff continues to

experience "problems from those injuries," and anticipates great hardship in losing the medical and disability veterans' benefits. (*Id.*) As the sole support system for his wife and two daughters, Plaintiff fears imminent homelessness as a result of a general discharge. (*Id.*)

*Hartikka* and *Sampson* denied preliminary injunctions for harms associated with "'external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself.'" *Hartikka*, 754 F.2d at 1518 (quoting *Sampson*, 415 U.S. at 92 n. 68). Both cases cited reputational stigma and loss of income as run of the mill injuries. *Id.* The injuries Plaintiff faces here appear to go beyond those indirect effects. The Court notes the likely termination of medical benefits in light of his service-related injuries, the extreme social stigma related to drug use, the foreclosure of his opportunity to pursue a higher education, and the strong likelihood that he will not merely suffer "loss of income" but rather serious difficulty in obtaining any employment as a 42-year-old with no relevant skillset outside that related to his Navy training. Plaintiff has certainly made out a showing of actual and imminent irreparable harm for the purposes of *Winter*. *See Winter* 555 U.S. at 20.

Additionally, this fact pattern appears to meet the special circumstance the Supreme Court contemplated in *Sampson*: "unusual actions relating to the discharge itself." *Sampson*, 415 U.S. at 92 n. 68. Dunlap's decision to seek out a different SA in an effort to oust Defendant without process is not a fact pattern the Court has been able to identify in any analogous military discharge caselaw. Likewise, Plaintiff's lawyer states in his sworn affidavit that such actions are "unprecedented." (Dkt. No. 2-1 at 4.) Thus, the injury here appears to be in part intrinsic to the discharge Plaintiff received rather than attributable to "external factors." *Sampson*, 415 U.S. at 92. While there is a paucity of caselaw on the matter, the Court takes seriously the Supreme Court's instruction to consider unusual actions relating to discharge in determining whether the

facts support a finding of irreparable injury. Accordingly, it concludes that Plaintiff has made a clear showing that he faces irreparable harm.

### B. Likelihood of Success on the Merits

"The federal courts do not sit to run the [Navy]" and will intrude into military matters only in extraordinary circumstances. *Denton v. Secy. of the Air Force*, 483 F.2d 21, 24 (9th Cir.1973). This is not for lack of jurisdiction but rather "out of deference to the special function of the military in our constitutional structure and in the system of national defense." *Sebra v. Neville*, 801 F.2d 1135, 1140 (9th Cir. 1986). But "[i]t is established, of course, that the federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations." *Matlovich v. Sec'y of the Air Force*, 591 F.2d 852, 859 (D.C. Cir. 1978); *see also Muhammad v. Secretary of Army*, 770 F.2d 1494, 1495 (9th Cir. 1985) ("Military discharge decisions are subject to judicial review.").

Plaintiff's challenge nevertheless implicates justiciability concerns because "[a]n internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies." *Khalsa v. Weinberger*, 779 F.2d 1393, 1398 (9th Cir.), *reaff'd*, 787 F.2d 1288 (1985). "If the plaintiff alleges both of these things, a court weighs four factors to determine whether judicial review of his claims is appropriate. These factors include: (1) The nature and strength of the plaintiff's claim; (2) The potential injury to the plaintiff if review is refused; (3) The extent of interference with military functions; and (4) The extent to which military discretion or expertise is involved." *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 17, 2002). Accordingly, to determine the likelihood of success on the merits, the Court must first determine whether this

case is justiciable under *Khalsa* and *Wenger*. Plaintiff meets the first *Khalsa* prong, as he alleges a violation of Navy regulations and 10 U.S. Code § 1169.

As for the exhaustion of administrative remedies, Plaintiff has not exhausted the remedy of review by the ADSEP board. As Plaintiff points out, this is "[t]he very administrative remedy that is . . . being denied to him." (Dkt. No. 2 at 10). Additionally, Plaintiff could seek administrative review of his upcoming discharge by the Board for Correction of Naval Records (BCNR), a process that is likely to take eighteen months or longer.[4] Plaintiff argues that "in the months and years the review board process would take, plaintiff will be suffering cataclysmic irreparable harm." (*Id*. at 12.) "[T]here are four circumstances in which exhaustion will not be required: (1) if the remedies do not provide an opportunity for adequate relief; (2) if the petitioner will suffer irreparable harm if compelled to seek administrative relief; (3) if administrative appeal would be futile; or (4) if substantial constitutional questions are raised." *Cooney v. Dalton*, 877 F. Supp. 508, 511 (D. Haw. 1995) (citing *Muhammad*, 770 F.2d at 1495). Here, petitioner will suffer irreparable harm if he is discharged and then compelled to seek BCNR relief. *See supra discussion*. Moreover, it would be absurd to prevent Plaintiff from litigating his claims about being unable to access an administrative process to which he is entitled because he has not exhausted that very administrative process. Moreover, Plaintiff's efforts at administrative appeal have—to date—been futile: he has repeatedly sought ADSEP board review to no avail. Accordingly, the Court finds that Plaintiff has successfully alleged both prongs of the *Khalsa* inquiry.

---

[4] *See Board of Corrections of Naval Records*, MILITARY LAW CENTER (2025), https://militarylawcenter.com/bcnr-application/ ("the BCNR aims to process applications within 18 months, but this can depend on the complexity of your case and the volume of applications they receive.).

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 2). - 9

The Court next considers the first *Winter* prong, a likelihood of success on the merits, together with the first *Wenger* factor, the nature and strength of the plaintiff's claim. *See Winter* 555 U.S. at 20; *Wenger,* 282 F.3d at 1072. "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction. As always, we begin with the text. If the regulation is unambiguous, its plain meaning governs." *League of Cal. Cities v. FCC*, 118 F.4th 995 (9th Cir. 2024). Here, the plain text meaning of the regulation at issue is unambiguous. "All cases of unknowing ingestion must be reviewed at an ADSEP board or board of inquiry" means that, if there is a case of "unknowing ingestion" it must receive ADSEP board review. OPNAVINST 5350.4E, Chapter 4, paragraph 6.m. "Unknowing (innocent) ingestion is the introduction of illicit, prescription or other drugs to a member's body without knowledge or consent by the member." *Id*. Taking someone else's "medication" is not considered innocent ingestion. *Id*. The THC gummies at issue were recreational cannabis sold legally to people in the State of Washington aged 21+ and regulated similarly to alcohol and nicotine products—not "medication." Plaintiff declares that he ingested the gummy without knowledge, a position supported by Captain Fahlenkamp. (Dkt. No. 1-1 at 20.) Accordingly, based on the plain text of the regulation and the evidentiary record before the Court, Plaintiff has made a strong preliminary showing that the Navy failed to follow its own regulation by discharging him without providing him with review by an ADSEP board. "It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful. The military departments enjoy no immunity from this proscription. It is the duty of the federal courts to inquire whether an action of a military agency conforms to the law, or is instead arbitrary, capricious, or contrary to

the statutes and regulations governing that agency." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979), *decision clarified*, 627 F.2d 407 (D.C. Cir. 1980) (internal citations omitted).

Likewise, it does not appear that Dunlap was acting with statutory or regulatory authority when he acted to override Sucato's determination by bringing the matter to a different Admiral. *See* MILPERSMAN 1910-704 (defining which senior officers may act as SA); MILPERSMAN 1910-708(d) (specifying that an ADSEP will be reviewed by the General Court-Martial Convening Authority as SA). The regulations state that an SA may elevate an ADSEP case to a commander in Washington to act as an SA if a case is "unique." MILPERSMAN 1910-702 (2.f.) ("Any SA can refer a case to NAVPERSCOM for final decision. This can be useful if unique circumstances are present. When an SA refers a case to NAVPERSCOM for final decision, the SA must provide reasons for the referral in an endorsement or letter of transmittal."). The existence of a specific regulatory process for advancing a case beyond a Sailor's de facto SA suggests that alternative means of doing so—such as Dunlap's finding a different Admiral—is not contemplated by the regulations. *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881 (9th Cir. 2005) (describing the canon *expressio unius est exclusio alterius*, which describes the maxim that when a statute specifies certain things or processes, the specific designation of such manners of operation excludes all others.) Accordingly, the legal status of the Wolfe's discharge of Plaintiff is highly questionable—given that the process by which Wolfe received the referral was not contemplated by the statutory scheme.

As for the second *Wenger* prong, the potential injury to the plaintiff if review is refused, the Court's discussion *supra* Section IV.A. establishes that Plaintiff is at high risk of irreparable harm if review is refused. *See Wenger* 282 F.3d at 1072. The third and fourth *Wenger* factors require the Court to evaluate the extent of interference with military functions and the extent to

which military discretion or expertise is involved in the matter at hand. *Id.* Here, the issuance of a TRO does not represent an interference with military functions—the case does not involve a deployed Sailor, a wartime situation, a consideration implicating national security or foreign relations concerns, or any time sensitive military matters. The only interference that will result from the issuance of a TRO is that Plaintiff will remain a Sailor for, at maximum, fourteen days. This preservation of the status quo does not infringe upon military functions.

"Personnel decisions are treated with a high level of caution against review by civilian courts." *Stein v. Mabus*, No. 312CV00816HBGS, 2013 WL 12092058, *6 (S.D. Cal. Feb. 14, 2013). Accordingly, Courts should be reluctant to substitute their judgment for the military's personnel decision-making. *Id.* This case does involve the relationships between military personnel and their superior officers—an arena in which this Court is extremely reluctant to interfere. However, the key issue hinges on a matter that is more Court business than anything else: the interpretation of the law. *C.f. Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195–198 (2012) (declining to apply the political question doctrine because courts are fully capable of determining the constitutionality of a statute). Here, the issue is a matter of interpreting the Navy's regulations. Issues of military preparedness, military training, military equipment, or military control are not present.

Accordingly, the Court determines that Plaintiff has satisfied the *Wenger* factors and presents a strong probability of success on the merits.

### C.     Public Interest and Balance of Equities

Plaintiff argues that the equities tip in his favor because "[t]he admin inconvenience to hold an ADSEP board is miniscule, when compared to what plaintiff has to lose." (Dkt. No. 2 at 22.) Likewise, he proposes that the public has a vested interest in a military that follows its own

regulations. The Court agrees. As the *Cooney* court put it, the Court "believes that the public has a strong interest in having a military that conducts itself fairly and according to its stated regulations and policies. If the military misapplies its own rules and unfairly discharges and stigmatizes a serviceman without giving him the constitutional consideration he is due, this erodes trust in the military." *Cooney*, 877 F. Supp. 508 at 515.

In conclusion, the Court takes the mandate of deference to military decisions seriously, but finds that in this instance, a TRO preserving the status quo pending further judicial review is warranted.

## V    CONCLUSION

For the reasons stated above, the court GRANTS the Plaintiff's Motion for a Temporary Restraining Order (Dkt. No. 2). Defendants are hereby restrained and enjoined from discharging Plaintiff pending this Court's hearing and consideration of Plaintiff's motion for a preliminary Injunction. The Clerk of Court is directed to set the matter for hearing on **Monday, March 24, at 1:30 p.m.** Defendants shall file responsive briefing by March 18, 2025. Plaintiff shall file his reply brief, if any, by March 20, 2025.

This order shall expire in 14 days unless otherwise agreed by the Parties with the approval of this Court.

Dated this 14th day of March, 2025.



David G. Estudillo
United States District Judge